T.C. Memo. 2018-69

UNITED STATES TAX COURT

JOSEPH C. BECKER AND MERCY GRACE CASTRO, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 17037-12, 27340-12,    Filed May 21, 2018.
27341-12, 27631-13,
27657-13.

William R. Leighton, for petitioners.

Sheila R. Pattison, Roberta L. Shumway, and Brooke S. Laurie, for

respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge: From 2007 through 2010 Mr. Joseph Becker owned at

least ten entities in the United States and another four in the Philippines. A great

---

[1] We consolidated four cases with this one: Joseph C. Becker and Mercy
Grace Castro, docket number 27340-12 and number 27341-12; Mercy Grace
Castro, docket number 27631-13; and Joseph C. Becker, docket number 27657-13.

**[*2]** portion of his income came from tax-return preparation; but he himself took a creative approach to his tax-return filing obligations for both himself and these entities, and now the Commissioner thinks he owes almost $3.5 million in deficiencies and penalties--including penalties for fraud. Mr. Becker, however, claims he wasn't up to any mischief and tried to create returns that reflected only the truth--or at least his version of the truth.

FINDINGS OF FACT

Mr. Becker and Ms. Mercy Castro wed in 1995 in Harris County, Texas. They had three children during their marriage. Mr. Becker and Ms. Castro lived together in Houston for most of their marriage, but in 2007 Ms. Castro moved to the Philippines with the children. She did not take Mr. Becker with her. Mr. Becker did visit her and the children about once or twice a month (except during tax season) during these years, and in 2010 Ms. Castro moved back to Houston. It wasn't a happily-ever-after ending, however; that same year the couple formally separated, and Mr. Becker moved to the Philippines. The couple divorced in 2012.

I.     Mr. Becker

Mr. Becker has an extensive background in federal taxation. He received his bachelor's degree in accounting from the University of North Florida, and a

[*3] master's in business administration in taxation from the University of Texas at Dallas. In 1989 he became a licensed CPA in Texas and worked for a series of accounting firms before he started his own tax-preparation business in 1993. But he soon did things that darkened his reputation. The Texas State Board of Public Accountancy suspended his license in 1996, and then revoked it entirely in January 2000. Mr. Becker nevertheless continued to do accounting work, but a state court enjoined him from the unlawful practice of public accounting in November 2002.

Two years later Mr. Becker passed all four parts of the Special Enrollment Examination.[2] The Commissioner was unable to admit him, however, because Texas had revoked his CPA license. Mr. Becker then got a license to sell insurance products in Texas. He maintained that license during all the years at issue.

II.    Sale of the Becker Businesses

Mr. Becker and Ms. Castro at first had all their businesses in the United States. In 2006, just before the years at issue, they decided to recenter their

---

[2] An enrolled agent is a regular person (i.e., neither a lawyer nor a CPA) who--by passing the Special Enrollment Examination--is allowed to represent taxpayers before the Internal Revenue Service.

**[\*4]** businesses in the Philippines.  The catalyst, Mr. Becker claimed during trial, was his father's death.  He just "wanted to get away."

A.    Sale of Becker's Insurance

Mr. Becker first hired a broker to find a buyer for Becker's Insurance.  He ended up selling it to an employee--Wayne Lee--for $350,000.  Mr. Lee signed a note for the purchase price payable to Mr. Becker over a 20-year period.  But whether Mr. Lee paid his debt to Mr. Becker is more controversial.  Mr. Becker, whose testimony we found most credible when he admitted prior wrongdoing, claims that for the years at issue, Mr. Lee paid only $30,000 on the promissory note.  We instead believe Mr. Lee's testimony that while he was late with some payments, he made them every month during each of the years at issue.  And in the record there are copies of some of the checks to prove it.

In addition to the note Mr. Lee gave for the purchase price, he borrowed $15,000 in a "business start-up loan" from Mr. Becker.  This loan--whose terms were oral--was payable over five years, and Mr. Lee paid it with a series of small checks.  Per Mr. Becker's instruction, Mr. Lee made each check payable to either Mr. Becker or one of his numerous related entities.

Mr. Lee took over operations at Becker's Insurance when the deal closed in July 2007--or at least that was how it was supposed to look.  We find, however,

[*5] that Mr. Becker continued to sell insurance products and earn income from their sale even after he sold Becker's Insurance. He and Ms. Castro continued to receive 1099s during this time, though Mr. Becker claims they didn't actually receive income but only allowed Mr. Lee to sell insurance under their licenses.[3]

### B. Sale of Becker's Tax Service

In July 2007 Mr. Becker sold Becker's Tax Service in an asset sale to Wealthbuilder Financial, Inc. (Wealthbuilder), for $3 million. The parties allocated $1.2 million of the purchase price to hard assets such as computers and furniture and $1.8 million to goodwill. Wealthbuilder also agreed to lease space at Champions Plaza--another of Mr. Becker's businesses--where Becker's Tax Service was located. This space included two large offices and a reception area. Mr. Becker also secured himself an outsourcing services agreement--technically between BTS Discount Outsourcing, Inc. (another of his businesses, introduced below), and Wealthbuilder. BTS Discount Outsourcing, Inc., contracted to perform data entry, accounting work (including review of client files), and other administrative services. In this way Mr. Becker maintained ties to his old company.

---

[3] Ms. Castro also had a license to sell insurance, though at the time of trial she was not sure whether it was still active.

**[\*6]** Mr. Becker also continued to hold himself out as an owner of the company. He told clients that Randall Klein--Wealthbuilder's president--was his business partner, not the new owner. He kept control over Becker's Tax Service's bank accounts--which should have been turned over to Mr. Klein--and he would direct clients to write checks to Becker's Tax Service so he could deposit them into one of his old firm's accounts and then move it to one of his personal accounts. Mr. Becker neglected to tell Mr. Klein about this, and when Mr. Klein found out, he filed suit--but that's for later. While Ms. Castro vehemently denied it during trial, we find that she also still received checks written on Becker's Tax Service's accounts after she moved to the Philippines in 2007. Mr. Becker claimed at trial they were payments for work Ms. Castro performed, but Ms. Castro also denied that she still worked for Mr. Becker after her move back to the Philippines, and we find her the more credible witness. We therefore find it more likely than not that the payments were personal rather than wages.

III.  Mr. Becker's Web of Companies

Although Becker's Insurance and Becker's Tax Service were the main operating businesses that Mr. Becker used, he also owned a series of somewhat similarly named businesses to which he added after he decided to leave the

[*7] country.  Each was, in many ways, a continuation of another--and we find they were meant to confuse anyone who was looking.  In order of their formation:

A.  <u>Becker's Tax Service and Financial Management Company, Inc.</u>

Mr. Becker incorporated Becker's Tax Service and Financial Management Company, Inc., in 1994 under Texas law.  We have no idea what it did.

B.  <u>BTS Financial Management Company, Inc.</u>

Mr. Becker formed BTS Financial Management Company, Inc. (BTS Management), in 1996, and it elected S corporation[4] status.  At the time of its formation, Mr. Becker filed two assumed-name certificates that stated BTS Management would conduct business under the names "Becker's Tax Service and Financial Management Company, Inc." and "National Mortgage Link, Ltd."  During all years at issue Mr. Becker operated as the president of BTS Management and owned 100% of the shares.  During this same time BTS Management had its offices at 7010 Champions Plaza Drive in Houston.

---

[4] An S corporation is a corporation governed under the laws of subchapter S of the Internal Revenue Code.  S corporations generally don't pay federal income tax but are, like partnerships, passthrough entities that channel income and deductions to their owners.  <u>See</u> <u>Gitlitz v. Commissioner</u>, 531 U.S. 206, 209 (2001).  Each shareholder must report his respective share of these items on his individual return.  <u>Hill v. Commissioner</u>, T.C. Memo. 2010-268, 2010 WL 5108761, at *4.

**[*8]**   C.     <u>Becker Tax Services, L.P.</u>

Mr. Becker formed Becker (note the lack of an apostrophe) Tax Services, L.P., in December 2000, though he operated as a tax professional under that name as early as 1993.  He routinely referred to it as Becker's Tax Service (note the wandering "s"), so we will as well.  BTS Management was, during all years of Becker's Tax Service's existence, its general partner and held a 1% interest.  JCB Family Limited Partnership (introduced below) held the remaining 99% interest as a limited partner.  Its offices were also located at 7010 Champions Plaza Drive in Houston.

D.     <u>JCB Family Limited Partnership</u>

Mr. Becker formed JCB Family Limited Partnership (JCB) in 2001.[5] During the years at issue Ms. Castro was a limited partner with a 40% interest and Mr. Becker owned the rest.

E.     <u>Sarahbelle Investments, LLC</u>

Mr. Becker formed Sarahbelle Investments, LLC (Sarahbelle), in 2003 as a limited liability company.  During each of the years at issue Mr. Becker was Sarahbelle's only member and acted as its president.  The Texas secretary of state

---

[5] We note a discrepancy here:  The parties did indeed stipulate that JCB was a partner in Becker's Tax Service before JCB came into existence.  This seems like it could be a mistake, but it is one that does not affect the outcome of the case.

[*9] forfeited Sarahbelle's certificate of formation in July 2010 for not paying taxes and fees to the state. See Tex. Tax Code Ann. secs. 171.251, 171.301, 171.309 (West 2015).

F. Champions Plaza Holdings, L.P

Mr. Becker formed Champions Plaza Holdings, L.P. (Champions Plaza), in August 2003 as a domestic limited partnership. During its existence Sarahbelle remained its general partner and held a 2% interest in the company. Champions Plaza also had two limited partners: JCB, which held a 97% interest, and someone named Jann P. Wellikson who held a 1% interest. Mr. Becker formed Champions Plaza to hold the Champions Plaza property.

G. 242 Professional Building, LLC

Mr. Becker formed 242 Professional Building, LLC (Professional Building) in August 2006 as a limited liability company. The Texas secretary of state forfeited Professional Building's certificate of formation in 2009. It's not clear from the record who owned Professional Building.

H. BTS Discount Outsourcing, Inc.

Mr. Becker formed BTS Discount Outsourcing, Inc. (BTS Discount) in January 2007 (originally under a different name) as a domestic for-profit corporation in Texas. He formed BTS Discount to operate a call center in the

**[*10]** Philippines.  Its offices were also located at Champions Plaza Drive.  BTS Discount ceased business operations after it received complaints for violating federal do-not-call-list rules.  The Texas secretary of state forfeited BTS Discount's certificate of formation in July 2010.  We find, based on testimony, that it is more likely than not that Mr. Becker was the sole owner of this firm.

### I.    Becker's Tax Service, LP, d.b.a. Becker's Insurance

It's unclear from the record when or where Mr. Becker formed Becker's Tax Service, LP, d.b.a. Becker's Insurance (Becker's Insurance).  This company should not be confused with Becker *Tax* Services, L.P., however, which, like Mr. Becker, we've been calling Becker's Tax Service.

### J.    1040+ Quality Tax & Financial Services, Inc.

Mr. Becker formed 1040+ Quality Tax & Financial Services, Inc. (1040 Plus), in December 2008 as a domestic for-profit corporation in Texas.  Milton Chavez and Layla Becker--Mr. Becker's daughter--acted as its directors.  1040 Plus was also located at Champions Plaza Drive.  Rene Bahamonde (one of Mr. Becker's employees) was initially listed in Texas records as 1040 Plus's president and vice president.  After some pressing at trial, Mr. Becker admitted that "by default" he must have owned 1040 Plus.

[*11] K.     Buy the Staff, Inc.

Mr. Becker formed Buy the Staff, Inc. (Buy the Staff), in March 2008 as a for-profit corporation in Texas.  The Texas secretary of state forfeited Buy the Staff's certificate of formation in May 2010, then reinstated it later that same year.  Because Mr. Becker had formed it to continue BTS Discount's operations after do-not-call-list violations left it defunct, Buy the Staff sometimes operated as BTS Discount.  Mr. Becker testified that he alone owned Buy the Staff.  And while Ms. Castro was listed as an officer of Buy the Staff, her role was entirely nominal.

L.     Becker's Tax Service Philippines

Mr. Becker's move to the Philippines propelled another wave of entities. He formed Becker's Tax Service Philippines (Becker's Tax Philippines) as a partnership and (as he did with each entity he formed) opened a bank account in its name.  Becker operated Becker's Tax Philippines as a call center with his brother-in-law--and its main purpose was to answer Becker's Tax Service's calls in Houston, though it also did some bookkeeping.

Mr. Becker had some help with his next steps.

M.     BTS Staff for Less

He met Ruth Ventura, a Philippine CPA and attorney, in October 2006.  She helped him set up BTS Staff for Less under Philippine law in August 2007.  (One

[*12] should not confuse this with Buy the Staff, a Texas corporation.) Ms. Ventura then opened a bank account for it (ending in 0586) at Banco de Oro Unibank (BDO) in Cebu City. BTS Staff for Less is also referred to as Becker's Staffing for Less and was a call center that Mr. Becker operated from the Philippines. He testified that he personally owned 60% or 70% of BTS Staff for Less, Ms. Castro owned 30%, and Ms. Ventura owned 10%. Each of them had signature authority over BTS Staff for Less's bank account.

Ms. Ventura managed the call center for a modest monthly salary. It provided services to Becker's Tax Service in Houston and generated income as an outsourcing company. In 2008 Ms. Castro signed a deed of absolute sale that transferred the Cebu City land, residence, and office to BTS Staff for Less, though Ms. Ventura testified during trial that they never recorded the transaction because there would be a "big tax obligation for the transfer" that Mr. Becker and Ms. Castro were either unwilling or unable to pay.

N.     Becker Realty and Asset Management Corporation

Ms. Ventura also set up Becker Realty and Asset Management Corporation that same year. This was another Philippine corporation originally formed to hold the Philippine properties. Although not entirely clear, we find it more likely than not that Mr. Becker and Ms. Castro split ownership of this one 60/40.

**[\*13]** O.    <u>Topline Telecare</u>

Ms. Ventura formed one last corporation, Topline Telecare (Topline), in 2010.  She owned 40% of Topline and Mr. Becker, through a nominee, owned the other 60%.  Topline operated a small call center out of Mandaue with only 20 employees.  Ms. Ventura hired and trained the staff.  She was again compensated to oversee the operation.  Unlike BTS Staff for Less, Topline hired few employees and kept its own revenue.  On the rare occasion that Topline could not cover its own expenses, Ms. Ventura would simply ask Mr. Becker for more money.

IV.    <u>Mr. Becker's and Ms. Castro's Philippine Activities</u>

Taking a step back now, when Ms. Castro moved to the Philippines in 2007, she needed a place to live.  And so Ms. Ventura helped Mr. Becker and Ms. Castro find a property there to call home.  They eventually settled on a 3,200-square-meter tract of land in Cebu City.  Mr. Becker claimed that he and Ms. Castro bought the land in Ms. Castro's name to meet certain requirements of Philippine law.  Before closing on the property, Ms. Ventura also helped Mr. Becker and Ms. Castro open numerous Philippine bank accounts, including:

- account ending in 1114 at Philippine National Bank (PNB);

- account ending in 7449 at BDO;

[*14] • accounts ending in 0334 at PNB and 6895 at BDO (little information on these accounts is contained in the record, though we do know Mr. Becker transferred at least some money to them).

Mr. Becker, Ms. Castro, and Ms. Ventura were each listed on the PNB and BDO accounts, and all three of them had signature authority over these accounts. Each time Mr. Becker sent money to the Philippines it was deposited into one of their Philippine accounts. And between 2007 and 2010 he wired at least $2 million into them.

Becker's Tax Philippines was already underway, and had been since 2006. So Mr. Becker turned his focus to his Philippine property and again engaged Ms. Ventura, this time to oversee the construction of a house and office there. Ms. Ventura withdrew funds from the PNB and BDO accounts to pay for construction materials and labor. She also used some of the money to pay her own monthly salary. In the end, Mr. Becker's Philippines move came with a hefty price tag: Ms. Ventura estimated during trial that the land in Cebu City cost almost $900,000, the residence there cost around $350,000, and the office building cost about $900,000. Mr. Becker and Ms. Castro completed their home in 2008. It was large--at least 10,000 square feet, spread over 2-1/2 stories, with 3-1/2 baths, 5 bedrooms, a pool, a guest house, and a 2-bedroom apartment above the garage. Ms. Castro and the children lived there and used money from Mr. Becker's wire

[*15] transfers to pay their personal living expenses. The office space was two stories and a short walk from the new home. When construction wrapped up in 2009, Mr. Becker moved key Becker's Tax Philippines employees there.

For a moment Mr. Becker's Philippine businesses did quite well, but trouble was gathering. In March 2008 Mr. Klein (of Wealthbuilder) canceled Mr. Becker's personal service contract for "committ[ing] acts of moral turpitude" that threatened to damage Wealthbuilder's business reputation. In revenge Mr. Becker changed the locks at the Champions Plaza property to prevent Mr. Klein from entering the offices. Within the next few months Mr. Becker, Becker's Tax Service, and Champions Plaza were buried in a lawsuit with Mr. Klein and Wealthbuilder for, among other things, fraudulent inducement to purchase and breach of contract.

Mr. Becker not only lost the revenue from the Wealthbuilder contract but also had to divert his other revenue streams trying to defend the suit. He got desperate and started to solicit "loans" from clients to increase his cashflow. The trial showed that he received over $200,000 in these "loans". He has not paid most of them back, and one client even sued him. She received a large judgment: $245,000 plus 5% interest per year and $690,000 in exemplary damages.

[*16] Mr. Becker tried to raise money other ways, too. He filed a claim with one insurance company after Hurricane Ike caused some damage to his Houston residence. While he estimated non-real-estate damage at $83,000, his insurance company paid him approximately $4,800--about 5% of his expectation.[6] For a time, he even engaged in a check-kiting scheme--one that, had he not been caught, would have netted him $384,000.

When Mr. Becker finally moved to the Philippines in late 2010, he converted the Cebu City property into a resort. He opened the residence's bedrooms up to guests, started an outdoor bar, and tried to convert the first floor of the call center into a nightclub. These new money-making plans were not successful.

V.     The 2007-2010 Tax Returns

For a man in the business of preparing tax returns, Mr. Becker had a dismal tax-return preparation record. He testified that he used QuickBooks to keep track of Becker's Tax Service's records. He also used QuickBooks, and at one point another program called AccountantsWorld, to keep track of payroll. It didn't seem to matter though, because he did not keep his many entities in compliance with

---

[6] We do note that his insurance company paid just under $200,000 for real-estate damages.

[*17] their filing obligations.  Here is each domestic entity's return status for the

2007 through 2010 tax years:

| Entity | 2007 | 2008 | 2009 | 2010 |
|--------|------|------|------|------|
| Becker's Tax Service Management | No return filed | Return filed | No return filed | No return filed |
| BTS Management | No return filed | Return filed | No return filed | No return filed |
| Becker's Tax Service | Return filed | Return filed | No return filed | No return filed |
| JCB | Return filed | No return filed | No return filed | No return filed |
| Sarahbelle | No return filed | No return filed | No return filed | No return filed |
| Champions Plaza | Return filed | Return filed | No return filed | No return filed |
| Professional Building | No return filed | No return filed | No return filed | No return filed |
| BTS Discount | No return filed | No return filed | No return filed | No return filed |
| 1040 Plus | n/a | No return filed | Return filed | Return filed |
| Buy the Staff | n/a | No return filed | No return filed | No return filed |

His personal returns were not better--he filed them on time, but did so

without first preparing returns for his flowthrough entities "because [he] needed

[*18] the money and wanted to get the refund." That this was his desire we find entirely credible--but it led him to take some unusual return positions.

Mr. Becker testified that he alone prepared his 2007 personal income-tax return. In preparing that return he relied on W-2s and did report interest income from Becker's Tax Service, but it is unclear whether he even looked at his own bank statements at the time. He based his interest deductions from Becker's Tax Service on purported loans that he admits he has no documentation for. He reported on his return that he did not have any interest in or signature authority over any foreign accounts despite the personal accounts he and Ms. Castro held in the Philippines, although he claimed that this was because he misunderstood the question.[7] He also admitted during trial that his reported "cost of goods sold" adjustments were not even educated guesses. Mr. Becker simply made sure he reported a number high enough to offset any income from the sale of insurance for which he'd received a Form 1099.

His 2008 return is also puzzling. He said he prepared it himself, yet the return reports another name as the preparer. His method of preparing this return

---

[7] We find it more likely than not that this is not true. Part III of Schedule B, Interest and Ordinary Dividends, asked very clearly whether he had "an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account" during the tax year.

[*19] was similar to what he had done for 2007: guessing. He guessed that he had $180,000 in gross receipts on his Schedule C, Profit or Loss From Business, for insurance sales, and just "put an amount [he] knew would cover whatever the 1099s were." He reported that he had $180,000 in expenses which zeroed out that Schedule C. One of his 2008 deductions was for money he claimed he borrowed from a lender and gave to Becker's Tax Service, but Mr. Becker's bank statements do not support this tale. He claimed during trial that he lent money that year, but it too wasn't reported. Neither did he report any of his interests or income or deductions from the Philippines: not his bank accounts, not his partnerships, and not his corporations. He claimed during trial this was just a mistake and that he meant to amend his return. We do not find this claim even a little bit credible.

Mr. Becker's 2009 and 2010 returns were similar. He testified that he prepared them himself, but again, at least the 2009 return shows a separate preparer. Mr. Becker again admitted that he guessed at what gross receipts he had and made sure he also claimed expenses large enough to entirely offset those receipts. He "just pulled a number out of the hat." On his 2010 return, he claimed two of his children as dependents even though they didn't live with him.[8]

---

[8] Mr. Becker also prepared Ms. Castro's 2010 return. Ms. Castro's return stated that she had $10,000 in income from consulting activity, but when asked

(continued...)

[*20] For all years at issue we find that Mr. Becker failed to report income he received from Mr. Lee for the sale of Becker's Insurance; and for 2007 and 2008, he failed to report income he received from Mr. Klein for the sale of Becker's Tax Service. We also find his Philippine business activities were completely missing from any return filed in the United States.

Mr. Becker prepared returns for Becker's Tax Service after he sold its assets. He consistently deducted "outsourcing expenses" on Becker's Tax Service's returns, but this was actually money that he wired to the Philippines to support Ms. Castro, his children, and to build his residence and office building there. He also deducted wages paid to Ms. Castro for work she didn't do. He reported many deductions on Becker's Tax Service returns: "If we had to pay, if we got something that we paid for--through Becker's Tax, I would have deducted it."

We compared Mr. Becker's personal tax returns and the returns for his various flowthrough entities, and found many inconsistencies: For example, though Mr. Becker had direct interests in BTS Management and Sarahbelle, he did not include them on his Schedule E, Supplemental Income and Loss, for 2007.

---

[8](...continued)
about it during trial, she knew nothing about it. Mr. Becker explained that he reported this $10,000 because it would get her "the biggest earned income credit."

[*21] And income reported on Becker's Tax Service's 2007 return and losses reported on Champions Plaza's 2007 return match amounts reported on JCB's 2007 return. But JCB's 2007 return reports positive income, and Mr. Becker and Ms. Castro reported a loss from JCB on their 2007 return.

This all caught the Commissioner's eye.

VI.    The Audit and Investigation

In December 2009 the Commissioner started an investigation of Mr. Becker and Becker's Tax Service. He suspected that either Mr. Becker or his company was preparing false returns, or at least aiding the preparation of false returns. The revenue agent (RA) assigned to the case--RA Jenkins--conducted a sworn interview of Mr. Becker as part of the investigation. Comparing Mr. Becker's statements during the investigation to his testimony at trial shows some important contradictions. For example,

- During his interview with RA Jenkins, Mr. Becker claimed that all of his insurance business's income and expenses were deposited into and paid through bank accounts held by Becker's Tax Service. He said that because clients sent the Forms 1099 to himself and Ms. Castro individually he filed Schedules C with his returns just to show how the money flowed through Becker's Tax Service. But during trial he said the money actually went to Mr. Klein's bank accounts.

- Mr. Becker told RA Jenkins that Mr. Klein took control of all Becker's Tax Service's bank accounts. Mr. Klein credibly testified at

[*22]     trial that he never took control.  And Mr. Becker changed his story at trial and admitted that Mr. Klein used his own bank account.

In June 2010 RA Bruno started to examine Mr. Becker and Ms. Castro's 2007 tax return.  The examination was quickly expanded to their 2008, 2009, and 2010 tax years.  RA Bruno then expanded the investigation to Becker's Tax Service's returns for the 2007, 2008, and 2009 tax years; Buy the Staff's returns for the 2007 and 2008 tax years; and 1040 Plus's returns for the 2008 and 2009 tax years.  She conducted her own interviews.  During those interviews:

- Mr. Becker claimed that Mr. Lee orally reported to him the gross receipts and expenses to report on his returns each year.  But during trial Mr. Becker repeatedly admitted that those numbers were guesses meant to offset income reported on Forms 1099 so it would not trigger an audit.

- Mr. Becker told RA Bruno that when he prepared his personal returns for the years at issue he used bank statements and that the returns showed correct information.  During trial he said only that he might have reviewed the accounts, but really just "pulled a number out of the hat."

Mr. Becker didn't cooperate with these examinations.  He promised RA Bruno that he would provide tax returns, bank statements, work papers, and other documentation--only to claim later that his records were destroyed by Hurricane Ike.  He promised to give her his QuickBooks records, but never did.  In the end, despite six information document requests (IDRs) from RA Bruno, Mr. Becker

[*23] never provided any documents at all. RA Bruno also issued two IDRs to Becker's Tax Service requesting the partnership agreement, its minute book, work papers, and other books and records. Mr. Becker never produced any of those either. Faced with this complete lack of cooperation, RA Bruno performed bank-deposits analyses on accounts held by Becker's Tax Service, Buy the Staff, and 1040 Plus for the 2007, 2008, and 2009 tax years. The totals, less reductions for nontaxable sources, for the 2008 and 2009 tax years are reflected below:

2008

| Item | Wachovia 2776 (Becker's Tax Service) | Wachovia 2763 (Becker's Tax Service) | Chase 0765 (Becker's Tax Service) | Wachovia 3635 (Buy The Staff) |
|---|---|---|---|---|
| Deposit | $228,077 | $1,874,504 | $1,025,419 | $49,764 |
| Nontaxable deposit | --- | (20,469) | (177,803) | --- |
| Nontaxable transfers | (192,711) | (128,655) | (20,000) | (6,000) |
| Total | 35,366 | 1,725,380 | 827,616 | 43,764 |

The combined taxable deposits equal $2,632,126. The Commissioner then reduced this number by:

- $39,608 for the Balboa Insurance Co. proceeds;

- $440,665 for a re-deposited cashier's check;

[*24]  •  $10,000 for the loan Mr. Becker got from Ms. Rothschild;

•  $5,000 for an additional loan; and

•  $1,684,732 for the amount Mr. Becker actually did report on his return.

This brings us to a grand total of $452,121 in unreported gross receipts.

### 2009

| Item | Wachovia 2776 (Becker's Tax Service) | Wachovia 2763 (Becker's Tax Service) | Wachovia 3855 (1040 Plus) | Wachovia 3635 (Buy The Staff) |
|---|---|---|---|---|
| Deposit | $47,212 | $162,979 | $2,264,980 | $107,236 |
| Nontaxable deposit | --- | (835) | (21,082) | --- |
| Nontaxable transfers | (10,616) | (67,377) | (104,621) | (3,811) |
| Total | 36,596 | 94,767 | 2,139,277 | 103,425 |

The combined taxable deposits equal $2,374,065. The Commissioner reduced this amount by $1,383,311 to account for allowed expenses, which produces a grand total of $990,754 in ordinary income. The Commissioner now concedes, however, that this amount should be reduced by $180,685 to account for payments Mr. Becker got from Balboa Insurance.

**[\*25]** RA Bruno also disallowed the deductions that Mr. Becker and Ms. Castro claimed on their personal returns, as well as the deductions that Becker's Tax Service claimed on its returns, because Mr. Becker never provided any substantiation during the examination. (Mr. Becker did produce some depreciation schedules for Becker's Tax Service's 2006 and 2008 tax years before trial.) The Commissioner sent three notices of deficiency to Mr. Becker and Ms. Castro for their 2007 through 2010 tax years in which he determined they owed more than $2 million in tax. In one of the notices--for the 2007-09 tax years, he stated that he had made a jeopardy assessment that included large fraud penalties under section 6663.[9]

The Commissioner introduced no evidence at trial that the IRS employee who made the initial penalty determinations had written approval from his immediate supervisor for the civil fraud penalty or an alternative accuracy-related penalty. Our recent opinion in <u>Graev v. Commissioner</u> (<u>Graev III</u>), 149 T.C. __,

---

[9] Because of section 6213(a)'s restrictions on assessment, the deficiency cases that come to our Court are typically preassessment. But section 6213(a) makes an exception for "jeopardy assessments" under section 6861, and that section authorizes the Commissioner to assess a deficiency even before issuing a notice of deficiency if he believes the assessment or its collection will be jeopardized by delay. (Unless stated otherwise, all section references are to the Internal Revenue Code in effect for the years at issue and all Rule references are to the Tax Court Rules of Practice and Procedure.)

[*26] ___ (slip op. at 13-14) (Dec. 20, 2017), supplementing 147 T.C. 460 (2016), prompted him to reexamine his files. He concluded that he had no record of the initial determination of penalties under section 6662(a) for negligence or disregard of rules and regulations for any of the years at issue. He also concluded that he had no record of the initial determination of a penalty under section 6662(a) for substantial understatement of income tax for the 2010 tax year. For the reasons stated in a separate order, we denied the motion as to other penalties and tax years.

Mr. Becker and Ms. Castro filed these cases. We consolidated and tried them in San Antonio.[10]

OPINION

The parties have settled or conceded many issues. Those that remain for us to decide are:

- whether Becker's Tax Service underreported its income for the 2008 and 2009 tax years;

- whether Mr. Becker and Ms. Castro failed to report income from the sale of Becker's Insurance for the 2008 and 2009 tax years;

---

[10] Under section 7482(b)(1), the presumed appellate venue is determined at the time the petition is filed with the Court. At the time Mr. Becker and Ms. Castro filed petitions at docket numbers 17037-12, 27340-12, and 27341-12, Ms. Castro resided in Texas and Mr. Becker resided in the Philippines. When they filed petitions at docket numbers 27631-13 and 27657-13, both Mr. Becker and Ms. Castro resided in Texas.

[*27] • whether Mr. Becker, Ms. Castro, and Becker's Tax Service are
entitled to certain deductions and cost-of-goods-sold adjustments for
the 2007, 2008, 2009, and 2010 tax years;

• whether Becker's Tax Service is entitled to depreciation deductions
for the 2007 and 2008 tax years; and

• whether Mr. Becker is liable for a civil fraud penalty under section
6663 for the 2007, 2008, 2009, and 2010 tax years.

We will address each issue in turn.

I.    Income Issues

      A.    Underreported Income

The Commissioner asserts that Becker's Tax Service underreported its
income by $451,650[11] for 2008 and $990,754[12] for 2009. Mr. Becker did not keep
adequate records of Becker's Tax Service's gross receipts--instead he guessed.
The Commissioner was thus justified in reconstructing Becker's Tax Service's
income. See secs. 6001, 446(b). One long-accepted method--used by the
Commissioner here--is a bank-deposits analysis. See Parks v. Commissioner, 94

---

[11] The Commissioner determined $452,121 of unreported gross receipts for
2008, but he concedes that the adjustment should be limited to $451,650 because
that is the amount that was included on the examination report.

[12] The Commissioner concedes that unreported gross receipts for Becker's
Tax Service should be reduced by $180,685 for the 2009 tax year for payments
Mr. Becker and Ms. Castro received from their insurance company as a result of
damages to their home by Hurricane Ike.

**[\*28]** T.C. 654, 658 (1990). Unexplained deposits are considered *prima facie*

evidence of income where a taxpayer failed to keep adequate records. Tokarski v.

Commissioner, 87 T.C. 74, 77 (1986). The Commissioner must, however, take

into account the sources of deposits. Clayton v. Commissioner, 102 T.C. 632,

645-46 (1994). And he must, as he has here, subtract from the deposits any

income that the taxpayer reported and any nontaxable items to determine gross

income. DiLeo v. Commissioner, 96 T.C. 858, 868 (1991), aff'd, 959 F.2d 16 (2d

Cir. 1992).

Our first question is what accounts the Commissioner can look at. Here, he

added up deposits from not only Becker's Tax Service's accounts, but also those

belonging to Buy the Staff's and 1040 Plus's bank accounts.[13] He has two

independent reasons for doing this. He first argues that deposits to these accounts

are attributable to Becker's Tax Service because Mr. Becker, through Becker's

Tax Service, exercised control over them. There's something here: It's true that

where a taxpayer has dominion and control over funds, they are includable in his

gross income under section 61(a). Chambers v. Commissioner, T.C. Memo. 2011-

---

[13] Both Buy the Staff and 1040 Plus got notices of deficiency from the
Commissioner, but neither filed a petition. The Commissioner acknowledges the
inconsistency of his position and in keeping with IRS practice will adjust these
firms' accounts accordingly to reflect the decisions in these cases and prevent
double collection.

[*29] 114, 2011 WL 2135376, at *7. And particularly when the Commissioner uses a bank-deposits method to reconstruct a taxpayer's income, he may include deposits from any account the taxpayer controls. See, e.g., Hovind v. Commissioner, T.C. Memo. 2012-281, at *35; Price v. Commissioner, T.C. Memo. 2004-103, 2004 WL 859198, at *11; Cohen v. Commissioner, T.C. Memo. 2003-42, 2003 WL 403067, at *4; Woodall v. Commissioner, T.C. Memo. 2002-318, 2002 WL 31890042, at *3.

A taxpayer has dominion and control over an account when he has the freedom to use the funds at will. See Rutkin v. United States, 343 U.S. 130, 137 (1952). The Commissioner asserts, and we agree, that Mr. Becker exercised dominion and control over Buy the Staff's accounts and 1040 Plus's accounts: He had signature authority over each account and managed the financial affairs of both entities. For example, Mr. Becker used money from a 1040 Plus account to pay a liability that did not belong to it, and frequently moved funds from Buy the Staff's accounts to Becker's Tax Service's. But the problem for the Commissioner is that at most this ties Mr. Becker, and not Becker's Tax Service, to each account. We cannot find that Becker's Tax Service itself exercised control over the entities' accounts. Perhaps recognizing this, he urges us to find that Becker's Tax Service

**[\*30]** controlled the accounts in question *through* Mr. Becker but offers no legal theory as to how.

Something similar is off with the Commissioner's second argument--that Buy the Staff is a nominee of either BTS Discount or Mr. Becker and that 1040 Plus is a nominee of Becker's Tax Service or Mr. Becker. The nominee theory requires us to determine the true beneficial owner of a property. Oxford Capital Corp. v. United States, 211 F.3d 280, 284 (5th Cir. 2000). We consider the following factors:

- consideration paid by the nominee;

- property placed in the name of a nominee in anticipation of a suit or occurrence of liabilities while the transferor continues to exercise control over the property;

- close relationship between transferor and the nominee;

- failure to record conveyance;

- retention of possession by the transferor; and

- continued enjoyment by the transferor of benefits of the transferred property.

Beck v. Commissioner, T.C. Memo. 2001-270, 2001 WL 1188462, at \*17. The Commissioner makes a reasonably strong case that Mr. Becker was the true beneficial owner of Buy the Staff's and 1040 Plus's accounts. But this doesn't

[*31] mean Becker's Tax Service was too:  Mr. Becker controlled Buy the Staff's operations and bank accounts.  The Commissioner argues that Buy the Staff's business reputation and affairs were often mixed with those of BTS Discount and that Mr. Becker testified that he would often move money deposited to Buy the Staff's accounts to Becker's Tax Service's.  Even if this proves Mr. Becker treated these entities as if they were the same, it doesn't make Buy the Staff a nominee of Becker's Tax Service, and the Commissioner doesn't ever argue that it did--thus not quite asking the right question here.

It's much the same for 1040 Plus--this firm, too, was in many ways an extension of Becker's Tax Service, but was not its nominee.  Mr. Becker created 1040 Plus to continue his tax-preparation activities when Becker's Tax Service ran into legal problems with Wealthbuilder and Mr. Klein.  He often deposited checks made payable to Becker's Tax Service and BTS Discount to 1040 Plus's accounts, and 1040 Plus used the same address and shared office space, employees, and equipment with Becker's Tax Service.  We do not find, however, that this makes 1040 Plus a nominee of Becker's Tax Service.

We therefore accept the Commissioner's bank-deposits analysis but only for deposits into Becker's Tax Service's own bank accounts.  There are no nominee

**[\*32]** problems here, of course, so the burden now shifts to Mr. Becker to prove

that part of the analysis is incorrect. See Clayton, 102 T.C. at 645.

He does not bear that burden well. He argues vaguely that many deposits

included in the Commissioner's analysis are nontaxable but provides no

explanation or evidence to suggest that's the case, with one exception: He does

argue that his 2008 taxable deposits should be reduced by $620,000--the amount

that he repaid after his check-kiting scheme was discovered in 2008. Aside from

the fact that Mr. Becker offered no evidence to corroborate his self-serving

testimony that he paid back $620,000,[14] the income earned from his check-kiting

scheme is the result of illegal activity and so there are no carryback deductions for

repayments. Ianniello v. Commissioner, 98 T.C. 165, 174 (1992); Mannette v.

Commissioner, 69 T.C. 990, 992 (1978) (taxpayer not entitled to carryback loss

resulting from illegal activity); see, e.g., Cherry v. Commissioner, T.C. Memo.

2013-3, at \*7-\*8.

Mr. Becker also argues that several 2009 deposits are nontaxable and that

the Commissioner erroneously included in his analysis checks from:

- Ferndale Surgical for $30,000,

---

[14] The record does reflect an $18,000 payment to Moody Bank during the 2010 tax year; that number is much smaller than what Mr. Becker claims.

[*33] •      Mary Phan for $200,000, and

•      Maria and Anthony Miller for $30,000.

He testified that these payments were all loans, but no matter. Each of these deposits, though written on a check made payable to Becker's Tax Service, was deposited to 1040 Plus's accounts and cannot be considered in these cases.

For these reasons we agree with the Commissioner's analysis of Becker's Tax Service's gross receipts, but only to the extent that it includes deposits made to Becker's Tax Service's own bank accounts.

B.      Income From Installment Sales

The Commissioner asserts that Mr. Becker failed to report income[15] from the sale of Becker's Insurance of $11,270 and $11,000 for the 2008 and 2009 tax years, respectively. Gross income includes income from whatever source derived. Sec. 61(a). Aside from the $30,000 Mr. Becker admits Mr. Lee gave him for the sale, Mr. Lee credibly testified that during the years at issue he continued to make payments each month, even if they were sometimes delinquent. Mr. Becker

---

[15] Under section 453(a) income from an installment sale is taken into account under the installment method. Under that method a taxpayer generally has income from an installment sale for the year the installment is received. While Mr. Becker seems to argue that the sale of Becker's Insurance should be classified as an installment sale subject to capital-gains tax, he has not provided a legal argument or evidence to support his position. He also testified that he did not treat payments as part of an installment sale when he received them.

[*34] admits he received them but claims that he deposited them into Becker's Tax Service's accounts--not his personal accounts--and reported them as ordinary income. Mr. Becker again offers us no evidence to corroborate his testimony and could not have reported the payments as ordinary income for Becker's Tax Service's 2009 tax year because Becker's Tax Service didn't file a return for that year. The Commissioner's analysis for those same years did not reveal these deposits, but the record does show that they made their way into Mr. Becker's personal accounts.

We therefore find for the Commissioner on this issue.

II.    Deductions

Section 162 allows a deduction for ordinary and necessary expenses paid or incurred in connection with a trade or business. We presume the Commissioner's determination in the notice is correct--the burden is on the taxpayer to prove his expenses. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). To do so, he must keep sufficient records to substantiate them. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs. When he does not, we may estimate some expenses, but only if he provides at least some evidence to support an estimate and we are convinced he incurred them. Cohan v. Commissioner, 39 F.2d 540, 543-44 (2d Cir. 1930); Vanicek v. Commissioner, 85 T.C. 731, 742-43 (1985). Under section 274, certain

[*35] expenses carry strict substantiation requirements. This means that a taxpayer has to show the amount, time, place, and business purpose of each expense, usually in the form of a contemporaneous account book, diary, or log. Sec. 1.274-5T(b) and (c)(1), (2), and (3), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).

The Commissioner determined that Mr. Becker was not entitled to the following claimed expenses:

|  | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|
| COGS | $253,325 | --- | --- | --- |
| Returns & allowances | --- | --- | $132,650 | $24,000 |
| Rent/lease | --- | --- | 120,000 | 13,000 |
| Meals & entertainment | --- | --- | --- | 940 |
| Travel | --- | --- | --- | 14,875 |
| Other | --- | $323,000 | 355,000 | 300,000 |

He also determined that Becker's Tax Service was not entitled to the following claimed expenses:

| [*36] | 2007 | 2008 |
|---|---|---|
| Outsourcing | $1,151,651 | $938,000 |
| Consulting | 340,000 | --- |
| Travel | 103,186 | 64,914 |
| Depreciation | 117,047 | 81,493 |

We will address each item separately.

A.     Mr. Becker and Ms. Castro

1.     Cost of Goods Sold (COGS)

Mr. Becker and Ms. Castro claim that they had a combined total of $253,325 for the cost of goods sold through their respective insurance businesses during the 2007 tax year. Mr. Becker admittedly made up this amount to offset income shown on the 1099s for insurance sales proceeds issued to himself and Ms. Castro. Mr. Becker's tale goes like this: Before the sale of Becker's Insurance, 1099s were issued to him and Ms. Castro for payments that were eventually deposited into Becker's Tax Service's accounts and reported as its income. After the sale, 1099s continued to be issued to Mr. Becker and Ms. Castro for sales they didn't make--proceeds from the sale of insurance were then deposited by Mr. Lee and reported by him. Mr. Becker claims that had he not zeroed out his return in this way, he would have been stuck paying tax on income he did not receive.

[*37] Even if we believed Mr. Becker, that's not how one is supposed to solve the problem. One might, for example, add an explanatory attachment to one's return instead of intentionally reporting false numbers. And even if a taxpayer wanted to solve a possible double taxation issue in this way, we would expect him to prove that income was deposited, or transferred into an account other than his own, and thereafter correctly reported. Mr. Becker has not done so. Mr. Becker and Ms. Castro are not entitled to a COGS allowance for the 2007 tax year. (Mr. Becker's method also leads to an understatement of self-employment tax under section 1401.)

### 2. Returns and Allowances

Mr. Becker claims he is entitled to deductions of $132,650 for 2009 and $24,000[16] for 2010 for "returns and allowances" expenses. These deductions represent amounts he claims he paid back to 1040 Plus that were later included on its returns. The deductions' purpose, Mr. Becker claims, was to again avoid the double counting of income. Mr. Becker offers only his incredible testimony as proof he paid these amounts, and that is simply not enough. We find for the Commissioner on these expenses.

---

[16] Though Mr. Becker labeled this amount "other expenses" on his Schedule C, we include it here because he now argues it was a return of income.

**[*38]**     3.     Rent

Mr. Becker claims that payments of $120,000 in 2009 were valid business deductions for payments made on his lease at Champions Plaza. He also claims that they are reflected on Champions Plaza's partnership return. Rent paid for office space is typically deductible, see sec. 162(a)(3); Carver v. Commissioner, T.C. Memo. 2009-279, 2009 WL 4877744, at *3; Davis v. Commissioner, T.C. Memo. 2006-272, 2006 WL 3780743, at *7, but as with his other items, Mr. Becker offers us only his testimony as substantiation. Champions Plaza's partnership return indeed reflects $120,000 in income, but that return was never filed. All we got was an unsigned copy of an amended Form 1065, U.S. Return of Partnership Income, that was provided by Mr. Becker during the Commissioner's examination. Without other information to substantiate this expense we cannot allow it.

Mr. Becker also claims, for the 2010 tax year, that he paid $13,000 in rent on behalf of 1040 Plus and can deduct that too. He likewise offers us only testimony and therefore has not substantiated his claim.[17]

---

[17] Even if Mr. Becker could substantiate his claim, "ordinary and necessary" expenses must have been incurred on behalf of the taxpayer's business, not on behalf of another taxpayer's business. Deputy v. du Pont, 308 U.S. 488, 494 (1940); Zand v. Commissioner, T.C. Memo. 1996-19, 1996 WL 23266, at *93,

(continued...)

**[\*39]**      4.      <u>Meals and Entertainment</u>

Mr. Becker claims that he is entitled to a $940 deduction for meals and entertainment expenses for his 2010 tax year. He argues that the Commissioner did not dispute the amount in his notice of deficiency and thus it is not actually at issue. This appears to be true. But that does not mean that meals and entertainment expenses are no longer at issue; it just means that because this is a new matter, the burden shifts to the Commissioner to prove that Mr. Becker is not entitled to that deduction. <u>See</u> Rule 142(a); <u>Heinbockel v. Commissioner</u>, T.C. Memo. 2013-125, at \*20 (shifting burden to the Commissioner where new matter raised not in notice); <u>but see</u> <u>Widemon v. Commissioner</u>, T.C. Memo. 2004-162, 2004 WL 1559185, at \*4-\*5.

The Commissioner has shown that Mr. Becker had a tendency to make up numbers on his returns, that he's not a credible witness, and that he did not keep satisfactory books and records. It's also quite clear from the record that Mr. Becker frequently deducted personal expenses--he deducted money he sent to Ms. Castro in the Philippines to pay her living expenses, <u>see</u> <u>infra</u> p. 42, and he deducted expenses incurred visiting his family there, <u>see</u> <u>infra</u> pp. 43-44. Though

---

[17](...continued)
<u>aff'd</u>, 143 F.3d 1393 (11th Cir. 1998).

[*40] Mr. Becker testified that he used credit-card statements to determine that he had $940 in business deductions, we find it more likely than not that either Mr. Becker had no substantiation for the amount or the expenses were personal. We find for the Commissioner on this issue as well.

5.     Travel

Mr. Becker also claims that he personally is entitled to $15,000[18] in travel expenses for his 2010 tax year. Travel expenses are of the type requiring strict substantiation under section 274(d), and Mr. Becker admits he has nothing of the sort to substantiate his claims. He asserts that he did have records, but that they were destroyed when Hurricane Ike caused flood damage to his home in September 2008. This certainly doesn't explain the lack of documentation for his 2010 tax year, and it doesn't explain why he provided absolutely no evidence for the remainder of Becker's Tax Service's 2008 tax year.

6.     Other

Mr. Becker and Ms. Castro claimed a combined total of $323,000 for 2008, $355,000 for 2009, and $300,000 for 2010 in "other" deductions. As with the

---

[18] Mr. Becker asserts that because the Commissioner failed to argue this issue in his brief, he has conceded the amount. He is mistaken. While the Commissioner admits he left travel expenses off the questions presented portion of his brief, he nonetheless did address and argue the issue in his brief and thus did not concede the issue.

[*41] allowance for COGS for the 2007 year, Mr. Becker admitted that he just plucked these numbers from his imagination to offset income reported on 1099s issued to himself and Ms. Castro. This is no more adequate substantiation for these expenses than it was for COGS.

### B. Becker's Tax Service

#### 1. Outsourcing

Mr. Becker claims Becker's Tax Service is entitled to deduct expenses of $1,152,000 for 2007 and $938,000[19] for 2008 that are related to the outsourcing of his business to the Philippines. He claims that he should be allowed a business expense deduction for the cost of building an office center and residence there-- that "the business purpose of the expenditures is undeniable." He claims that the Philippine residence was really a guest house for employees and clients. He concedes, however, that he does not have sufficient documentation to identify which of those expenses were ordinary or capital and urges us to simply treat the full amount claimed for each year as a capital expenditure.

The problem, as the Commissioner points out, is that even if a portion of each number was a true capital expenditure, we have no way to tell how much.

---

[19] Becker's Tax Service claimed the $938,000 as "other costs" on its 2008 return, but Mr. Becker now argues they were outsourcing expenses.

[*42] Ms. Ventura testified that while she did wire money from Becker's Tax Service's accounts to pay for the construction, she also wired money to pay Ms. Castro's living expenses and her children's living expenses. Ms. Ventura claimed she kept records but provided only a sample at trial, and the remainder is not part of the record. We also find it more likely than not that the "guest house" was never anything more than Ms. Castro's and Mr. Becker's personal residence. We thus do not find that Mr. Becker is entitled to either a deduction or a capital expenditure. See, e.g., Rogers v. Commissioner, T.C. Memo. 2014-141, at *40-*41 (taxpayer loses when personal and business expenses indistinguishable).

2. Consulting

Becker's Tax Service claimed a $340,000 deduction for consulting expenses on its 2007 tax return. Mr. Becker argues this amount was the total paid to Mr. Seyad Aman. He says that Mr. Aman would charge "substantial sums" on his credit card, and the amount would then be reported as income by Becker's Tax Service. Becker's Tax Service would then reimburse Mr. Aman by check. This explanation is strikingly similar to Mr. Becker's earlier arguments for zeroing out his returns. And it likewise is not enough to substantiate the expenses. There are no canceled checks in the record showing payments to Mr. Aman, much less any

**[\*43]** that show *what* those payments were for. We sustain the Commissioner's determination.

3. Travel

Becker's Tax Service claims $103,000 and $65,000 in travel expenses for its 2007 and 2008 tax years. Travel expenses are of the type that require strict substantiation under section 274(d), and Mr. Becker admits he has nothing of the sort to substantiate his claims. He contends that we should find in his favor because it is obvious that he, through Becker's Tax Service, conducted extensive travel to oversee the building of his operations in the Philippines. We don't think it's obvious, however. We find it instead more likely than not that at least a portion--probably a large portion--of Becker's Tax Service's travel costs was for Mr. Becker's personal trips to the Philippines to visit his wife and children and to oversee the construction of his residence--even if he also did work while he was there. See sec. 1.162-2(b)(1), Income Tax Regs. We have no way of telling which was which. We therefore sustain the Commissioner's disallowance of these travel expenses.

4. Depreciation

Section 167(a) generally allows a depreciation deduction for the exhaustion or wear and tear of property used in a taxpayer's trade or business, or held for the

**[\*44]** production of income. Mr. Becker claims that Becker's Tax Service is entitled to $117,000 and $81,000 in depreciation expenses for its 2007 and 2008 tax years. Depreciation is determined by using the applicable depreciation method, convention, and the recovery period. Sec. 168(a). Mr. Becker did not submit a schedule for the 2007 tax year. He did submit as evidence 2006 and 2008 depreciation schedules--the 2006 schedule being part of a return accepted as filed by the Commissioner--and asserts that because Becker's Tax Service still owned the items on that schedule in 2007 and 2008, we should allow the depreciation deductions. Each tax year stands on its own, however, and the Commissioner is not bound by his treatment of an item for a previous year. Pekar v. Commissioner, 113 T. C. 158, 166 (1999); Tanzi v. Commissioner, T.C. Memo. 2016-148, at \*9-\*10. Because Mr. Becker did not provide any additional support for his position, we sustain the Commissioner's determination.

III.  Penalties

A.  Fraud

Section 6663 imposes a penalty equal to 75% of an underpayment that is attributable to fraud. The Commissioner determined that Mr. Becker is liable for the civil fraud penalty under section 6663 for the 2007, 2008, 2009, and 2010 tax years because he filed his tax returns with the intent to evade tax. The burden is

**[*45]** on the Commissioner to show by clear and convincing evidence that Mr.

Becker underpaid and that the underpayments are attributable to fraud. Sec.

7454(a); Rule 142(b). If the Commissioner can prove that even any part of an

underpayment was attributable to fraud, the "the entire underpayment shall be

treated as attributable to fraud, except with respect to any portion of the

underpayment which the taxpayer establishes (by a preponderance of the

evidence) is not attributable to fraud." Sec. 6663(b).

Fraud is the "willful attempt to evade tax." Beaver v. Commissioner, 55

T.C. 85, 92 (1970). We examine the entire record of a case in making our

determination. See id. at 93. The "badges" that show fraudulent intent include:

- understatement of income;

- inadequate records;

- failure to file tax returns;

- implausible or inconsistent explanations of behavior;

- concealment of assets;

- failure to cooperate with tax authorities;

- engaging in illegal activities;

- attempting to conceal illegal activities;

- dealing in cash; and

**[\*46]** • failing to make estimated tax payments.

Meier v. Commissioner, 91 T.C. 273, 297 (1988) (citing Bradford v. Commissioner, 796 F.2d 303, 307-08 (9th Cir. 1986), aff'g T.C. Memo. 1984-601).  Our goal is to uncover the taxpayer's intent.  Did he, or did he not, intend to evade income tax?  While we won't find fraud when the circumstances merely lead to a suspicion of fraud, we may use circumstantial evidence--which includes Mr. Becker's entire course of conduct.  See Parks, 94 T.C. at 664.

This entire course is filled with obstacles to any finding other than that Mr. Becker had a fraudulent intent--and filled with them for all four years at issue.  Mr. Becker consistently understated his income for each year.  He admitted during trial that he made up massive deductions each year to zero out his returns--fake deductions that amounted to over $1.2 million over the course of the four years.  He failed to report income for at least 2008 and 2009--remember our earlier findings regarding installment sales.  See supra pp. 34-35.  He omitted great dollops of income from Becker's Tax Service's returns for those years.  See supra pp. 28-34.  And he completely omitted his business activity in the Philippines for each of the years before us; for 2007 he checked "no" in response to a question on his Schedule B that asked whether he had foreign bank accounts or signature authority on foreign bank accounts.

**[\*47]** Mr. Becker also provided implausible and inconsistent explanations for his behavior. Examples of these are exhibited through conversations during the Commissioner's examination: Mr. Becker admitted during trial that his Schedules C were entirely fabricated, but he told the RA that Mr. Lee told him to report those numbers. He also maintained during the examination that Mr. Klein took control of all Becker's Tax Service's bank accounts after the sale, but we found out during trial that Mr. Klein opened his own account. Mr. Becker also gave inconsistent explanations for his lack of records. During the examination he promised to turn in documents requested by the examiner. Then he changed his mind and said they'd been destroyed by Hurricane Ike.

He played a similar game when it came to Becker's Tax Service's records. Mr. Becker said he had backup files for Becker's Tax Service, but then said that the records couldn't be produced after all--because they'd been seized shortly after his check-kiting scheme came to light.

Mr. Becker took steps to conceal his assets. He filed a zeroed-out or low-tax return for each year at issue. He also filed zeroed-out returns for 1040 Plus for the 2009 and 2010 tax years--and made it appear that a CPA had prepared them. We also find that Mr. Becker's complicated scheme of entities, most of which have like-sounding names, was meant to confuse and distort ownership in the

[*48] event someone--like the Commissioner--ever looked too closely. Over the course of his examination the Commissioner uncovered at least 10 domestic entities in which Mr. Becker held direct or indirect interests--many of which were doing business under two different names. He used at least 30 different bank accounts to commingle funds from these entities. He tried to conceal his ownership of 1040 Plus: He filled in Mr. Bahamonde's name as its director, registered agent, president, and vice president; but Mr. Bahamonde testified that he never acted in these capacities, nor did he know he was listed. And he tried to conceal all of his activity in the Philippines by not reporting or disclosing it in any way on even a single return.

Mr. Becker also failed to cooperate with the examining agent and lied during the examination *and* during trial. The Commissioner's examination spanned more than two years, and for those two years Mr. Becker delayed and failed to produce documents and changed his explanations over time. During trial he insisted that money sent to Ms. Castro while she was living in the Philippines was payment for work she performed for Mr. Becker's many entities. But Ms. Castro credibly denied the truth of these statements, and claimed she didn't work for Mr. Becker or his entities during those years. Mr. Becker was evasive during

**[*49]** trial, and seemingly reluctant to answer questions, specifically about his control over the Philippine entities.

We also consider a taxpayer's level of sophistication in tax matters. See Neidringhaus v. Commissioner, 99 T.C. 202, 211 (1992); Brown v. Commissioner, T.C. Memo. 2013-275, at *44; Scharringhausen v. Commissioner, T.C. Memo. 2012-350, at *37. Mr. Becker's trade was tax preparation, but he failed to properly report his own tax. And for many of his entities he filed no tax returns at all. See supra pp. 17-18. It's unlikely that a tax professional such as he would accidently or even negligently report (or not report) his taxes in this manner. We find instead by clear and convincing evidence that Mr. Becker attempted to use his vast tax-preparation experience to help him evade his own legal obligations.

B. Section 6751

All of this would normally lead to a holding that sustains the Commissioner's civil fraud penalty determinations for the 2007 through 2010 tax years. But we held in Graev III, 149 T.C. at ___ (slip op. at 13-14), that compliance with section 6751(b)(1)--which requires written supervisory approval of an initial penalty determination--is part of the Commissioner's burden of production on penalties under section 7491(c). The Commissioner never even mentioned section 6751 before or at trial even though Mr. Becker and Ms. Castro

[*50] put the penalties at issue in their pleadings and hotly contested them on their merits. Today we denied the Commissioner's motion to reopen the record.

This makes these cases among those that have to consider what consequences such failures to anticipate <u>Graev III</u> have. Section 6751 has been in the Code for nearly 20 years. <u>Graev III</u> didn't create new law; it interpreted a section of the Code that was in existence at the time of the trial in these cases, and we didn't say that our interpretation had only prospective effect. <u>See, e.g.</u>, <u>Harper v. Va. Dept. of Taxation</u>, 509 U.S. 86, 97 (1993) (when the Court applies a rule of federal law in a case, that rule "must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate * * * announcement of the rule"); <u>Hajro v. U.S. Citizenship & Immigration Servs.</u>, 811 F.3d 1086, 1099 (9th Cir. 2015) ("Silence on the issue [of prospectivity] indicates that the decision is to be given retroactive effect").

These precedents mean that we have to treat our construction of section 6751(b)(1) in <u>Graev III</u> as being the correct construction of that section as of the date of this trial as well. But Mr. Becker and Ms. Castro didn't mention section 6751 either. Might this mean that the Commissioner could still win on the penalty because it was not placed in issue?

**[*51]** The answer to this question is in <u>Wheeler v. Commissioner</u>, 127 T.C. 200 (2006), <u>aff'd</u>, 521 F.3d 1289 (10th Cir. 2008). That case began with the Commissioner's determination that the taxpayer was liable for three additions to tax. <u>Id.</u> at 202. In his petition Mr. Wheeler noted his assertion that he was not liable for any additions to tax, without saying why or specifying each of the additions at issue. <u>Id.</u> at 202 n.3, 203, 207. He presented no relevant testimony or arguments. <u>Id.</u> at 204. We found that the record lacked any evidence that Mr. Wheeler had filed a return for the year in question or that the Commissioner had prepared a substitute return under section 6020(b)--a prerequisite for the failure-to-timely-pay addition to tax under section 6651(a)(2). <u>Id.</u> at 208, 210. The record similarly lacked any evidence that Mr. Wheeler had a required annual payment for the preceding tax year--a prerequisite for the addition to tax for underpaying estimated tax. <u>Id.</u> at 212.

Because section 7491(c) places the burden of production for any penalty or addition to tax on the Commissioner, we held that the Commissioner must lose when there is no evidence in the record that he met these prerequisites. <u>Id.</u> at 210, 212. It's the same here. We now know that section 6751(b)(1) requires the Commissioner to show by stipulation or other evidence that the initial determination of a penalty was approved in writing by the immediate supervisor of

[*52] the IRS employee who made "the initial determination of such assessment." Graev III, 149 T.C. at ___ (slip op. at 14). We now also know that section 7491(c) makes this showing part of the Commissioner's burden of production. The Commissioner introduced no such evidence that he complied with section 6751. Just as in Wheeler, this means the Commissioner loses on the penalties here.[20]

Thus, even though Mr. Becker's fraud is evident, we hold that he and Ms. Castro are not liable for civil fraud penalties or accuracy-related penalties in these cases.

Decisions will be entered under

Rule 155.

---

[20] The Commissioner asserted as an alternative to fraud penalties that Mr. Becker and Ms. Castro were liable for accuracy-related penalties under section 6662(a) for all of the years at issue (except for 2010 for Ms. Castro). Mr. Becker and Ms. Castro challenged the section 6662(a) penalties in their petition, so they are before the court and the Commissioner has the burden of production. See sec. 7491(c); Rule 34(b)(4); Wheeler v. Commissioner, 127 T.C. 200, 206-07 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008). The record contains no evidence that the Commissioner complied with section 6751 for these penalties either, which means he didn't meet his burden for them. If he had, we would've treated them as conceded because Mr. Becker and Ms. Castro didn't address them in their brief. See McNeil v. Commissioner, T.C. Memo. 2011-150, 2011 WL 2559802, at *1 n.3, aff'd, 451 F. App'x 622 (8th Cir. 2012).